## LEE v. THE STATE.

1. There is no error in refusing to grant a mistrial in a criminal case because of the use of improper language by the solicitor-general during the trial, when it is certain that no injury could have resulted therefrom to the accused.

2. There is no error in the charges complained of ; such of the requests to charge as embody correct statements of the law were fully covered by the general charge ; and the evidence authorized the verdict.

116 563
Case 2
118 9
s118 765

Argued October 21, — Decided November 13, 1902.

Indictment for murder. Before Judge Candler. Fulton superior court. July 12, 1902.

The parts of the charge of the court as to which error is assigned are as follows :

" The law presumes every person to be of sound mind; and in this case I charge you that the burden is upon the defendant to satisfy you to a reasonable certainty that, at the time of the commission of this act in question, he was not of sound mind and discretion ; and I further charge you that what is meant by this expression in law is, if a man has sufficient reason to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible, as a general rule. If he has not sufficient reason to distinguish between the right and wrong of a particular act about to be committed, he is not criminally responsible for that act. The unsoundness of mind which excuses from

crime is such as dethrones reason and renders an individual incapable of distinguishing between the right or wrong of a particular act." It is alleged that this was error, because the right and wrong test given is not the law ; that the insanity need not be such as dethrones reason and incapacitates from distinguishing between the right or wrong of a particular act as charged ; and that the test for insanity given by this charge is inconsistent with that portion of the charge subsequently given, in which the court charged that if by reason of the duress of mental diseases the defendant had lost the power to choose between right and wrong, and free agency was destroyed, he would not be responsible, etc.

"A person in order to be punishable by law must have sufficient memory, intelligence, reason, and will to enable him to distinguish between right and wrong in regard to the particular act about to be done ; to know and understand that it would be wrong, and that he would deserve punishment for committing it." It is alleged that this was error, for the reasons assigned as to the preceding extract ; that the right and wrong test here given is too rigid, and the quantum of intelligence required thereby too small to furnish an invariable rule by which to determine sanity or insanity.

" On the other hand, a person may be deranged as to other things ; yet if he has sufficient reason or mind to distinguish as to the right or wrong of that particular act about to be committed, if he knows and understands that for committing that act he would be liable to be punished, he is responsible." It is alleged that this was error, for the reasons assigned as to the preceding extracts ; that it is a repetition and argumentative ; that in view of the testimony introduced by the defendant, to the effect that he was an epileptic, and that when the acute spells of epilepsy seized him he was incapable of controlling his actions, the charge was too rigid ; and that the knowledge of right and wrong is erroneously put by the judge as depending on an understanding as to whether he would be liable to be punished for his act, whereas, even if the right and wrong test were proper, the knowledge of right and wrong required is greater than that put by the judge, and the defendant should have greater knowledge of the right or wrong of his act than merely that it was unlawful and deserved punishment.

" Therefore, you will look to the evidence in this case and see, at the time this act was committed, whether the accused had suffi-

cient mind or reason, or mental capacity, to know that the act was wrong; in other words, that it was a violation of the law, and he would be liable to be punished for it. If he did not, then he is not responsible to the law and ought not to be; because the law does not allow an insane man to be convicted, or a man who has not sufficient capacity to have a criminal intent to be convicted. But if he did know, although he may have been insane or peculiar about other things,— if he did know at the time he committed that act, and he had understanding and reason sufficient to know that it was a violation of the law, and that he would be punishable for it, then the jury would be authorized to find him guilty." The assignments of error as to this part of the charge are similar to those made in regard to preceding portions.

"As charged you, the law presumes every man to be of sound mind until the contrary appears; and the burden of proof is upon the defendant to show that at the time of the commission of the act in question he was not of sound mind, and of the sound mind I have explained to you. The burden is on the defendant to make it appear to a reasonable certainty, and to your reasonable satisfaction, that at the time of the commission of the act charged, he was not legally responsible." It is alleged that this was error, because if there was a reasonable doubt of insanity, there was one of guilt, and the prisoner should have been acquitted; and because the burden was not on the defendant as charged, but if the evidence on the question of sanity, taken in connection with the other evidence in the case, raised a reasonable doubt of guilt, there should have been an acquittal.

Error is assigned on the refusal of the court to charge as follows: (a) "If the evidence in this case on the subject of insanity, when taken in connection with all the testimony in the case, raises in your minds a reasonable doubt of the defendant's guilt, then you should acquit him. (b) The very definition of murder involves the proposition that the accused must be of sound memory and discretion; and if you have in your mind a reasonable doubt as to the defendant's sanity, you should acquit him. (c) In passing upon the defense of insanity you should view it from an entirely unprejudiced and impartial standpoint. The circumstances of the alleged crime may be looked to in passing upon the issue of insanity; but the circumstances of atrocity which might have attended the

homicide should in no way bias, prejudice, or influence your verdict upon the issue of insanity.    (*d*) If the jury believe from the evidence that at the time of this homicide the defendant was afflicted with epilepsy to such an extent as to be insane, and that under the influence of such epilepsy he was incapable of controlling his action, but was impelled by the effect of such disease to the commission of the homicide in question, then he would not be guilty, even though you find that he may have had, in the abstract, knowledge as to the right or wrong of the act in question."

*Arnold & Arnold,* for plaintiff in error.    *Boykin Wright, attorney-general,* and *C. D. Hill, solicitor-general,* contra.

SIMMONS, C. J.    Under an indictment charging him with murder, Millard Lee was convicted.    He moved for a new trial; the motion was overruled, and Lee excepted.    The evidence shows that Lee attended church, and after the services asked permission of Miss Lillie Suttles, a young lady, to accompany her home.    She replied that she had a previous engagement; whereupon he drew his pistol from his pocket and shot her twice, inflicting a wound which produced her death.    When the case against Lee was called for trial, he filed a special plea of present insanity.    The jury returned a verdict against the plea.    Among the witnesses introduced on the trial of this special plea were three physicians who testified as to Lee's mental capacity.    On the trial of the present case Lee's defense was that he was insane at the time of the homicide, and was therefore not responsible for the commission of the act.    After the State had closed its testimony, Lee's counsel introduced the court stenographer for the purpose of proving that on the former trial, on the special plea, the State had introduced these three physicians as witnesses.    This evidence was excluded by the court.    Counsel for the accused then offered to prove that the State had put up these witnesses at the first trial, that they had been present during the second trial and had been present all day, and had not been put on the stand.    The court ruled that this would be irrelevant.    The solicitor-general then stated: "I want it put in the record that when the State put them up they all swore that the defendant knew the difference between right and wrong."    All of this occurred in the presence of the jury.    Counsel for the accused then moved for a mistrial.    The motion was overruled, and

this ruling is complained of in the motion for a new trial. Subsequently to the overruling of the'motion for a mistrial, two of the three witnesses were introduced by the State, and testified as the solicitor-general stated they had testified upon the first trial. The third was not introduced. The question now presented to us is whether the trial judge erred in refusing to grant a mistrial on account of the improper remarks of the solicitor-general. While this court has been strict in rebuking improper remarks by prosecuting officers, and in many cases has granted new trials because prosecuting officers have made statements of fact outside of the record which were hurtful to the accused or calculated to prejudice his rights before the jury, we do not know of any case in which this court has granted a new trial on account of remarks or statements which, although improper, were not prejudicial or calculated to prejudice the rights of the accused. Of course the trial of cases should be conducted with proper decorum, and no counsel should ever in his remarks go outside of the record and state facts not contained therein, whether they be material or immaterial. The verdict of a jury and judgment of a court are, however, solemn things and should generally not be set aside on account of anything which could not have prejudiced the minds of the jurors against the losing party. The decisions of this court will show that it has nearly always granted new trials where improper remarks or statements were made and the proper motion was made in the court below. On the other hand, it has frequently denied new trials in such cases where it was apparent that the remarks or statements could not have affected the rights of the parties before the jury.

With these preliminary remarks, we will now look into the merits of this motion and try to determine whether the remarks of the solicitor-general were calculated to prejudice Lee or his case before the jury. The defense of the accused was that he had been for years afflicted with epilepsy, and that when he was attacked by it he lost his memory, his reason, and his self-control; that his will was overpowered by the violence of the attacks, and what he did upon such occasions he was unable to resist doing. In the argument here his able and learned counsel insisted that the right and wrong test had nothing to do with Lee's case. Some of the written requests to charge, presented to the trial judge, show that this was the theory of the defense in the court below. This be-

ing so, did the remarks of the solicitor-general, that these physicians had testified on the former trial that Lee knew right from wrong, prejudice the case of the accused? It seems from reading the testimony of the witnesses for the accused, as set forth in the brief of evidence, that the accused's knowledge of right and wrong was not really in issue before the jury. Therefore the solicitor's remarks could not have prejudiced the rights of the accused. The real theory of the defense seems to have been that the attack of epilepsy destroyed the will-power of the accused, and that under its influence, although he knew the difference between right and wrong, he could not control his actions but was impelled to do what he did. The solicitor's remarks could not have affected the case one way or the other. As to Lee's knowledge of right and wrong there was no real controversy. The statement of the solicitor could not, then, have prejudiced the accused as to this matter, and it related to no other. For these reasons we think the case falls within the principle ruled in *Hoxie* v. *State*, 114 *Ga.* 19, that "the use of unfair or improper language by an attorney in arguing a case will not be held cause for a new trial when it is certain that no injury could possibly have resulted therefrom to the losing party." For similar reasons we think there was no error in refusing to grant a new trial on the ground that the court had refused to declare a mistrial because the solicitor, when counsel for the accused called attention to the fact that but two of the three physicians referred to above had been introduced by the State, made a statement to the effect that the third was the witness of the accused and had been sent to examine the accused by his counsel. This statement, while improper, could not have prejudiced the rights of the accused.

2. The motion for new trial complains of the refusal to give in charge to the jury certain requests, and of certain instructions which were given. We have carefully examined these grounds, and have come to the conclusion that there was no error committed in either of these respects, when considered in connection with the entire charge of the court. This able and admirable charge covers the whole law of insanity as a defense, in accordance with the decisions of this court. It is true there is a decided difference upon this subject between the opinion of the courts of this and other States and that of able and distinguished alienists. This court has uniformly

held since its organization that the knowledge of right and wrong is the test, generally, where insanity is relied upon as a defense. The alienists contend that this is an improper test; that nine tenths of the insane in asylums and sanitariums know the difference between right and wrong almost as well as sane persons. While this may be true, the courts, for the preservation of 'society and public order, have not generally agreed with these experts. The time may come when we shall have a better understanding of the intricacies of the human mind, the workings of the human brain, and the diseases incident thereto ; when the courts may yield to the arguments of the alienists as they did in Hadsfield's case, upon the argument of Lord Erskine, in regard to delusions produced by mental disease which overmastered the will. So far as this court is concerned, we are bound, under the code, by our former rulings upon this subject, unless application is made to us in proper time to review and overrule them. In the case of *Fogarty* v. *State*, 80 *Ga.* 450, learned counsel made contentions similar to those made in the present case, under almost the same state of facts, to wit: the defense of epilepsy overpowering the will of the accused. In that case the proof of the existence of epilepsy and of its influence on the mind of the accused was very much stronger than in this. Counsel in that case asked this court to overrule its former rulings upon this subject. After a review of the cases this court expressed itself as satisfied with their soundness and wisdom. The charge of the court in the present case followed these former decisions as to the general rule and as to the exception in regard to delusional insanity. The requests to charge, in so far as they were correct and pertinent, were fully covered by this general charge, and the portions of the charge complained of were not erroneous for any of the reasons assigned.

When a man who attends to his ordinary business with some degree of success, who has been slighted by a young lady with whom he is in love and has threatened to be revenged, who on the morning of the homicide shaves and dresses himself, hitches his horse to his buggy, attends church and sits quietly through the services, making no demonstrations of anger or hallucination or delusion, who after the conclusion of the services approaches the young lady and asks permission to accompany her home, and, upon her refusal, shoots her to death, and who thereupon walks out of

the house, keeping back with his pistol those who attempt to arrest him, goes to his father's home and gets from him, in addition to the money he already has, other money which his father owes him, makes his flight, and, upon his capture the next day, seems to remember all that has happened, it is difficult for a layman or non-expert to conceive that at the time of the shooting the slayer had no knowledge of what he was doing, as one of the experts testified was possible, although he might have a recollection of it the next day. It seems to us that to uphold such a theory would be to put the public at the mercy of any person who fails to suppress his anger or jealousy; who is sane at one moment, insane at the next, and then immediately afterward sane again; and all this without any outward sign of the change in his mental condition. It is, however, useless to elaborate any further, as this court is bound by its former decisions upon this subject, which will be found cited in *Carr* v. *State*, 96 *Ga.* 284; *Taylor* v. *State*, 105 *Ga.* 746; *Minder* v. *State*, 113 *Ga.* 772. We therefore conclude that those requests to charge, which sought to substitute another test of sanity for the knowledge of right and wrong, should not have been given. With regard to the exception to the general rule in case of delusional insanity, the charge was correct, and followed the cases of *Roberts* v. *State*, 3 *Ga.* 310; *Danforth* v. *State*, 75 *Ga.* 614; *Flanagan* v. *State*, 103 *Ga.* 619. Under the rules laid down in the above-cited cases, the finding of the jury was right; for the accused knew the difference between right and wrong, and acted upon real circumstances and the ordinary perceptions of the mind, and not upon any morbid delusions. There was no error in refusing a new trial.

*Judgment affirmed. All the Justices concurring, except Lumpkin, P. J., absent, and Candler, J., not presiding.*